1   **DOUGLAS L. RAPPAPORT (SBN 136194)**
    **JOANNA P. SHERIDAN (SBN 260090)**
2   Rappapprt & Sheridan
    260 California Street, Suite 1002
3   San Francisco, CA 94111
    Tel. (415) 989-7900
4   Fax. (415) 989-7950

5   Attorneys for Defendant
    **KEITH GOODMAN**
6

7                    UNITED STATES DISTRICT COURT

8              FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                      SAN FRANCISCO VENUE

10

11   UNITED STATES OF AMERICA,            Case No.: CR-11-798-CRB

12              Plaintiff,                **DEFENDANT   KEITH   GOODMAN'S**
                                          **SENTENCING MEMORANDUM.**
13          v.
                                          Date:  April 26, 2018
14   KEITH GOODMAN,                       Time: 1:30 p.m.
                                          Judge  Charles R. Breyer
15              Defendant.

16   _____/

17   TO THE UNITED STATES OF AMERICA, PLAINTIFF, AND ALEX TSE, UNITED STATES
     ATTORNEY; THE ASSISTANT UNITED STATES ATTORNEY ANDREW MAST; AND TO
18   THE CLERK OF THE ABOVE-ENTITLED COURT:

19                        **INTRODUCTION**

20          In the years following the housing mortgage collapse in 2009, the real estate foreclosure

21   market was in a state of mass disarray. This uncertainty left huge avenues open for unscrupulous

22   individuals to exploit the banks' misfortunes and this is what occurred here on the courthouse steps

23   in San Francisco. Mohammed "Mo" Rezaian and four others, collectively known as the "Big Five,"

24   illegally controlled the auctions of foreclosed properties by any means possible, including the use

25   of coercion, intimidation and violence.

26          Enter Mr. Keith Goodman, an honest, decent man with a successful nineteen-year career as

27   a financial advisor who naively ventured onto the courthouse steps, initially to purchase a foreclosed

28   home in San Francisco for he and his wife, and then seeing the potential opportunities, to acquire

1   homes as investments.  Because Mr. Goodman worked full-time at Morgan Stanley, he partnered

2   with co-defendant Craig Lipton, a longstanding real estate investor and broker with experience in

3   joint ventures who also owned a construction company. When Mr. Goodman learned that Mr.

4   Rezaian and others were demanding to be paid off in exchange for not bidding on properties, Mr.

5   Goodman refused to be extorted and balked. The price for his resistance was verbal harassment,

6   threats, and at one point, physical violence. Ultimately, however, Mr. Goodman acquiesced and was

7   involved with others in bid rigging on nine distressed properties in San Francisco. Without the initial

8   intent, Mr Goodman eventually evolved into one of the unscrupulous people that he initially fought

9   against.

10       For his lapse in otherwise impeccable judgment, Mr. Goodman accepted responsibility,

11   entering a plea in January, 2012 to bid rigging under 15 U.S.C. §1.[1]  As a consequence, he lost his

12   career, his retirement, his professional licenses and most devastatingly, the opportunity to adopt a

13   child, all factors under 18 U.S.C. §3553(a) which this court may consider when fashioning an

14   appropriate sentence. And while the United States Probation Office recommends that Mr. Goodman

15   be sentenced to three years of probation with six months of electronic home confinement, Mr.

16   Goodman is respectfully seeking one year of probation with no electronic monitoring, a sentence

17   which is both just as sufficient, but not greater than necessary, to achieve the statutory objectives of

18   sentencing.

19   \\

20   \\

21   \\

22   \\

23

24           [1]

25    At the time of entry of plea, Mr. Goodman also pled to Conspiracy to Commit Mail Fraud, a violation of 19
     U.S.C. § 1349. However, the United States and Mr. Goodman are in agreement that at the time of sentencing

26   Count II of the Indictment, the Mail Fraud offense, will be eliminated either by dismissal of the charge in the
     Indictment or by the filing of an amended plea agreement to a violation only of Count I (Bid Rigging - 15

27   U.S.C. § 1). It is defense counsel's understanding that the government will nevertheless recommend that the
     fine remain as stated in Mr. Goodman's plea agreement, which was at the low end of the applicable mail

28   fraud range of $3,000 - $30,000.

1  \\

2  ## POINTS, AUTHORITIES, AND ARGUMENT

3  **I.  A Sentence of One Year Probation, Restitution and a Fine is Sufficient, but Not Greater than Necessary, to Fulfil the Purposes of Sentencing.**

As this court is well aware, after *United States v. Booker*, 543 U.S. 220 (2005) was decided, it became clear that district courts had been "empowered .... to engage in individualized sentencing...." (*United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (citing *United States v. Vonner,* 516 F.3d 382, 392 (6th Cir. 2008)). After accurately calculating the applicable Guideline range, district courts must consider fully the factors set forth in 18 U.S.C. § 3553(a) and impose a sentence that is sufficient but not greater than necessary to achieve the statutory objectives of sentencing. (*Rita v. United States*, 551 U.S. 338, 347 (2007); *Gall v. United States*, 552 U.S. 38, 49-50 (2007)). District courts may not simply presume that sentence within the guideline range is appropriate under the circumstances of the individual case. (*Booker*, *supra*, 543 U.S. 259-250; *Rita*, *supra*, 551 U.S. at 351).

The 18 U.S.C 3553(a) factors include (1) the nature of the offense and the defendant's personal history and characteristics, (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant, (3) the kinds of sentences available, (4) the applicable guideline range, (5) any pertinent policy statement, (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

In *Whitehead*, the Ninth Circuit found no abuse of discretion in the district court's probationary sentence including conditions of community service, restitution and supervised release to defendant convicted of selling counterfeit access cards which caused a loss of over 1 million dollars to DirecTV. Despite the fact that the Guideline range was 41 to 51 months imprisonment, the court found that Whitehead had repented from the crime and thereafter devoted himself to building his business and to being an honorable father to his eight year old daughter who depended on her

1     father for support. (532 F.3d at 993).

2          Similarly, in *Gall*, the district court's sentence of 36 months probation to a defendant

3     convicted of conspiring to distribute the drug "ecstasy" was upheld, despite the Guideline

4     recommendation of 30 to 37 months imprisonment and lengthy prison sentences given to his

5     co-conspirators. The district court imposed a probationary sentence in light of Gall's voluntary

6     withdrawal from the conspiracy and self rehabilitation, noting that "[a]ny term of imprisonment in

7     this case would be counter effective by depriving society of the contributions of the Defendant who,

8     the Court has found, understands the consequences of his criminal conduct and is doing everything

9     in his power to forge a new life." (552 U.S. at 44).

10         As in *Whitehead* and *Gall*, the unique circumstances of Mr. Goodman's case which are

11    discussed below, including his background for honesty and commitment to the community, why he

12    became involved in bid rigging, his own rehabilitation over the last six years, and the far-reaching

13    consequences of his plea, all favor probation without confinement. As the court observed in *Gall*,

14    imposing a term of imprisonment would be counter effective by depriving society of the

15    contributions of a hardworking man who, with the exception of this offense, is someone who follows

16    the rules, complies with ethical guidelines, and helps those less fortunate than himself.

17

18    **II.     The Section 3553(a) Factors Favor Probation for One Year, Restitution and a Fine.**

19         **A.     Keith Goodman's Character and Background.**

20         From a young age, Keith Goodman has been a socially-engaged, caring, and hardworking.

21    As his parents put it, "[m]ost people who know him call him a mensch." (January 28, 2018 letter

22    from Herbert and Tanya Goodman, attached as Exhibit A). He has been a member of San Francisco's

23    Beth Shalom Synagogue since birth, volunteered 20 hours a month at the Jewish Federation and

24    Jewish Community Center during high school and college, obtained good grades and most

25    importantly, is patient and understanding with his older brother Greg who suffers from mental

26    illness. (*See*, Exhibit A; PSR ¶ 46; April 18, 2018 letter from Rabbi Aubrey Glazer, attached hereto

27    as Exhibit B).

28         After high school, Keith went on to college and graduated with a bachelor's degree in

sociology from UCLA.  Thereafter, he chose to pursue a career in the financial services industry and

obtained Financial Industry Regulatory Agency "FINRA" Series 6 and 7 licenses. By the age of 22,

Mr. Goodman was working for Shearson Lehman Brothers in their San Mateo Office.  Charles A

Phelps, the branch manager who hired Mr. Goodman, recalled that,

> "[f]or the next eleven years, I watched Keith grow as a person and grow his career
> as a Financial Consultant. Unlike some in the industry, where there is always a
> temptation to cut ethical corners to improve the bottom line, Keith was always
> cautious in being certain he complied with all regulatory and ethical rules and always
> erred on the side of caution." (January 25, 2018 letter of Mr. Phelps, attached as
> Exhibit C).

Keith loved his career and devoted himself to helping his clients build their financial futures.

He stayed with the same company for 19 years, through many mergers, working his way up to the

rank of Senior Vice President at Morgan Stanley Smith Barney's San Mateo Office. In 2012, when

Keith entered into his plea agreement in this matter, he felt that it was imperative to be honest and

disclosed this fact right away to his employer.  Mr. Phelps recalls when Mr Goodman came to him:

> "Keith conducted himself with the utmost professionalism, putting his clients and his
> employer before himself." "[A]lthough his conduct and subsequent plea did not
> involve Morgan Stanley (Shearson Lehman's successor) or its clients, he felt that it
> was important to disclose what had happened...to make sure that Morgan Stanley was
> not adversely affected." "This is just another example highlighting that despite his
> very serious mistake in judgment, he is nevertheless, a man of character." (Exhibit
> C).

Throughout his twenty-year career as a financial advisor, Keith Goodman's commitment to

giving back to his community - not just of his money but also of his time and energy - has stayed

strong. Holli Thier, a member of the State Bar for 27 years who is now in elected office as Member

of the Tiburon Town Counsel, writes that she met Keith Goodman when they both sat as volunteer

board members on the Jewish Community Federation Young Adult Division Board, and,

> "[m]y first impression of Keith was that he gave his energy and time to the cause
> because he sincerely cared for our community. He hosted social gatherings, delivered
> meals to the needy and coordinated fund-raising efforts, always focusing on how he
> could make a positive impact in the world." (January 31, 2018 letter of Ms. Thier,
> attached as Exhibit D).

Ms. Thier recalled that not only did Keith help raise funds for a mission trip to Argentina,

but that she was very impressed because he,

> "[s]pent his time while we were in Argentina sitting down with those who had lost
> everything to listen to their needs. He offered his time and energy to try and find

solutions that would make their lives better. When Keith and I served on the YAD Board, he served as Chair of the Latke Ball Committee, served food at Glide Memorial Church, and was involved in numerous other fundraisers and nonprofit work with me. I was impressed then by his hands-on commitment to community service..." (Exhibit D).

During one of the volunteer fund-raising events Keith hosted for the Jewish Federation in 2010, he met his wife, Alison Goodman (nee Jacobs). Alison was also a native of San Francisco, who had attended college at Loyola Marymount University and then obtained a graduate degree in school counseling at the University of San Francisco. On their very first date, they discussed having a family, a dream they shared, and in the Fall of 2010 they were married.  As more fully explained later in this Memorandum, this dream to have children has been dashed after learning that they can not have a biological child of their own and that his felony conviction here legally bars adoption.

**B.    Keith Goodman's Conduct in this Case**

Mr. Goodman initially became interested in real estate auctions in 2009 when a property he wanted to purchase for he and his wife was listed for sale by auction. It was then that he saw the investment potential in buying distressed homes to refurbish and resell.

**1.    Keith first experiences the strong arm tactics of Mohammed "Mo" Rezaian.**

On March 29, 2010 Mr. Goodman next returned to the courthouse steps in San Francisco, only this time as a potential investor. This was Mr. Goodman's first attempt to purchase an investment property and his first interaction with Mo Rezaian. When bidding on a home located at 758 Moscow Street, Mr. Rezaian bid against Mr. Goodman, driving up the price.  After Mr. Goodman won the auction, Mr. Rezaian took the time to teach Mr. Goodman who was in control, telling Keith that he had bid the price up deliberately without any intent to buy the property just so that Mr. Goodman would not be able to make a profit.

**2.    Risks on the Courthouse steps lead to a partnership with Craig Lipton.**

As Mr. Goodman continued to work full-time as a financial advisor, following the debacle at 758 Moscow Street, he reached out to Craig Lipton, an experienced San Francisco real estate investor with prior experience in property joint ventures, who also owned his own construction company and a real estate brokerage firm.

Ultimately, Mr. Goodman decided that the knowledge and skills that Mr. Lipton had

developed by working for decades in the field would ease many of the time constraints and risks involved in purchasing properties at auction. By the middle of May 2010, Mr. Goodman and Mr. Lipton settled on a partnership arrangement whereby Mr. Lipton took primary responsibility for researching the properties, attending the auctions, managing the renovations and listing the properties for resale. Mr. Goodman, who did not attend all of the auctions that Mr. Lipton did (PSR ¶ 15), was primarily responsible for providing the investment capital.

**3.    Mr. Goodman urged Mr. Lipton not to make payoffs to stop bidding because it felt like extortion.**

On July 20, 2010, Mr. Goodman and Mr. Lipton were both present for the auction of 2094 46th Ave. This was the first occasion during their partnership when a payment was made to stop others from bidding. Unbeknownst to Mr. Goodman at the time, Mr. Lipton agreed to make a $9,000 payoff to stop others from bidding. When Mr. Goodman learned about the agreement after the auction, he was upset, and although he did not appreciate that the conduct was illegal at that time, he asked Mr. Lipton not to make payoffs in the future because it "didn't feel right" because the five ring leaders were just extorting money. Mr. Lipton's feeling was that the payments were necessary to "keep the peace."

While Mr. Goodman was out of town on August 8, 2010 and then again on December 22, 2010, Mr. Lipton made additional payments to stop others from bidding on the properties located at 171 Trumbull and 60 Rausch, respectively. Mr. Goodman did not have advance knowledge of Mr. Lipton's intent to make the payments and he was upset when he found out. Nevertheless, Mr. Goodman acknowledges that he is legally responsible for his partner's conduct on those occasions and profited equally from the payoffs.

**4.    Mr. Goodman continued to stand up to the "ring leaders" and refuse to make payoffs.**

Mr. Goodman's efforts to do what felt right to him weren't limited to just urging his partner to stop making extortionate payoffs; he also stood up and refused to make these payments when he was present on the steps without Mr. Lipton. Specifically, on August 18, 2010, Mr. Goodman refused to pay or be paid by Mo Rezaian during the auction of 274 Vernon Street. (PSR ¶ 16). When Mr. Goodman won the auction, Mr. Rezaian loudly berated and belittled Mr. Goodman for five

1   minutes in front of everyone on the steps, stating that he was involved in every property sold at the

2   auction and that Mr. Goodman had cost everyone money by not participating in the payoff.

3          Again on December 3, 2010, Mr. Goodman stood up to Mr. Rezaian's when Mo attempted

4   to coerce a payoff during the auction of 2209 9th Avenue. (PSR ¶ 16). Mr. Goodman, Lydia Fong

5   and Mr. Rezaian qualified and bid on this property. At the outset, Mr. Rezaian told Mr. Goodman

6   that Ms. Fong was willing to pay $30,000 for others to not bid against her. Mr. Rezaian went back

7   and forth, trying to broker a deal to be paid out, but Mr. Goodman refused. Eventually, Ms. Fong

8   walked away, Mr. Goodman bid and won the property. Rezaian taunted Goodman that he could have

9   saved $20,000 if he just agreed to the payoffs.

10         It should be noted that these properties are not on the Government's stipulated list, because

11  Mr. Goodman never made a payment in restraint of trade, but they do illustrate that Mr. Goodman

12  was true to his word that he wanted to bid without making extorted payoffs.

13         **5.      Mr. Rezaian's threats and harassment turn to physical violence.**

14         In addition to threats and intimidation tactics to drive away competition and insert himself

15  into every deal to extract a payoff, Mo Rezaian also used physical violence. While Mr. Rezaian

16  frequently taunted Mr. Goodman as he was bidding, calling him a "monkey," this intimidation

17  crossed the line into physical violence after the auction of 5 Orsi Street. On November 12, 2010 Joe

18  Giardo and Mr. Goodman negotiated a partnership to jointly purchase this property, and Mr. Rezaian

19  apparently felt that Mr. Goodman's share was too generous. Mr. Rezaian charged at Mr. Goodman

20  and head butted him, yelling that the rules of the auction were his and that Mr. Goodman had to

21  follow Mr. Rezaian's rules. This assault, which left visible injury on Mr. Goodman's head, drew the

22  sheriffs out of City Hall to clear the auction area, and caused Mr. Goodman to go into City Hall to

23  get away from Mr. Rezaian. (PSR ¶ 16, fn 1).

24         **C.      Mr. Goodman's atonement and rehabilitation.**

25         As a lifelong, active member of the Beth Shalom Synagogue, Mr. Goodman sought spiritual

26  counsel from his Rabbis to work through the shame and remorse he felt from being involved in this

27  criminal conduct. As Rabbi Dr. Aubrey L. Glazer writes,

28         "I have counseled and studied with Keith[sic] about his feelings of genuine remorse

known as *charatah* after the mistakes he made in transgressing the law and the poor judgment that led to it in the past. Keith is acutely aware of, and committed to, the process of *teshuva* or rehabilitation so as to realize atonement for these actions. To effect this atonement, Keith has undergone both the spiritual introspection as well as the commitment of his time and energy to help those in need." (Exhibit B.)

Rabbi Glazer goes on to describe that Keith's rehabilitation has included attending prayer services, supporting other community members in times of loss and tragedy, and delivering hot meals to the elderly and sick as part of Congregation Beth Shalom's program called "*Chicken Soupers*." (*See*, Exhibit B).

**D.   Unique Consequences of this Conviction for Keith Goodman**

**1.   Loss of 20-Year Career and Professional Licenses**

As previously discussed, Keith Goodman excelled as a financial advisor - a career he truly loved. After disclosing his conviction to Morgan Stanley, Keith was terminated. (Exhibit C). Shortly thereafter, he lost his FINRA Series 6 and 7 financial trading licenses thereby preventing Mr. Goodman from obtaining work in his chosen profession. (PSR ¶ 57). In addition, when he lost his position at Morgan Stanley, one of additional consequences was that he had to forfeit most of his Capital Accumulation Plan earnings, the equivalent of 25% of his salary deferred for approximately 15 years. (Exhibit C).

**2.   Loss of Ability to Adopt Children.**

As Alison Goodman writes in her letter attached hereto as Exhibit "E," when growing up, each year her mother recorded what she wanted to be when she was older, and without fail, Alison always replied, "a mother." In eighth grade, Alison's classmates voted her most likely to " have ten kids." (Yearbook Entry regarding Alison "Jacobs," attached hereto as Exhibit F). She began babysitting at seven years old and worked as a nanny to support herself through college and graduate school. (January 31, 2018 letter from Dell Jacobs's, Alison's mother's, attached hereto as Exhibit G). Thereafter, Alison taught school and for the last twelve years, has been a middle school counselor. She loves her job even on the toughest days, she writes, but her "true calling in life is now, as it has always been, to be a mother." (Exhibit E).

When Alison met Keith, despite good dating advice dictating otherwise, she mentioned her desire to have children on their first date. To her great joy, doing so led to a wonderful connection,

1  as they both shared their mutual hope to be parents. After several years of marriage, however, Alison

2  and Keith learned that they could not conceive naturally and so turned to medical science for

3  assistance.  As Dr. Cedars explains in her letter attached hereto as Exhibit "H," after four cycles of

4  IVF–each cycle taking several months and involving multiple injections, doctors visits, and

5  emotional and physical ups and downs–Alison was able to conceive on her fifth and seventh

6  attempts, but lost the baby each time, the last pregnancy lasting twelve weeks.  After four more

7  cycles, bringing the total to eleven, the doctors concluded that "it has been determined that the

8  couple will not be able to successfully have their own biological child."

9       Thus, given the daunting news that having their own child was not possible, Keith and

10  Alison began looking into adoption, an option that seemed viable, especially given that Alison's own

11  mother was herself adopted. Tragically however, despite the fact that they will make wonderful

12  parents and that there are so many foster children who need good, stable and loving homes, the

13  Goodman's will be legally and practically prevented from ever adopting because of Mr. Goodman's

14  felony conviction. According to Anne Gyemant Paris, an attorney specializing in adoption for the

15  last twenty years, a felony conviction immediately disqualifies the Goodman's from adoption

16  through the "fost-adopt" process, will bar international adoption, and in her experience, effectively

17  eliminate the possibility of private adoption. (January 18, 2018 letter from Gyemant Paris Law,

18  attached hereto as Exhibit I).

19       **E.     Mr. Goodman Objects to a Stay Away Order from Mr. Lipton.**

20       The PSR recommends a condition of probation wherein Mr. Goodman is ordered to stay

21  away from all co-participants, including Mr. Lipton. However, Mr. Goodman and Mr. Lipton remain

22  friends and still own properties together. Mr. Goodman has never been arrested before and has

23  certainly learned from his mistakes in this case. It is therefore respectfully requested that the stay

24  away provision be eliminated, at least as to Mr. Lipton.

25       **F.     Mr. Goodman Requests No Travel Restriction Condition of Probation**

26       Mr. Goodman has been on pretrial supervision for over six years, patiently waiting for the

27  prosecution of the "Big Five" to wind up. He has abided by the restrictions and reporting obligations

28  of supervision without fail, made every court appearance, and is not considered a flight risk by

probation. (PSR, p. 17). Mr. Goodman travels domestically - both for business and personal reasons - with some frequency, and while he has faithfully abided by the pretrial supervision requirement that he obtain permission prior to travel for more than six years, he asks that the Court relieve him of this component of supervision and allow him to travel within the United States during the period of probation without having to obtain permission from the probation department.

## **CONCLUSION**

Keith Goodman is not someone who set out to take advantage of the banks' misfortunes during the mortgage collapse of 2009. Yet, despite is initial resistance, he ultimately found it easier to go along to get along and profited from it. For this, he will be forever sorry and deeply remorseful, most especially since his lapse in judgment will result in a sentence of a life without children. Therefore, under the provisions of 18 U.S.C § 3553, a sentence of one year probation, a fine and restitution will sufficiently accomplish the goals of sentencing for a man who has already been severely punished and will never, ever be before this court ever again.

Respectfully submitted this 18th day of April, 2018

By:     /s/
**JOANNA P. SHERIDAN**

By:     /s/
**DOUGLAS L. RAPPAPORT**
Attorneys for Defendant
**KEITH GOODMAN**

# EXHIBIT A

Herb and Tanya Goodman                                    January 28, 2018
1300 Cabrillo Street
San Francisco CA 94118


To Whom It May Concern:

I would like to tell you about our family and our youngest son, Keith. My husband Herb and I have been married for over 50 years and have lived in San Francisco for the greater part of that time. Herb, is a retired internist and I used to work with children with special needs. Our older son, Greg, is unmarried and suffers from mental illness. We all provide for him and get him the support he needs on an ongoing basis. Keith has been a wonderful son and brother and has always been there for our family at a moments notice.

Keith has always been independent, caring and nurturing. Most people who know him call him a "mensch." He is especially patient with Greg and will stay on the phone with him until Greg sorts out what he needs to say and is in a better place. We are so proud of the man Keith has become. Keith has always been an extremely responsible, honest, and a hardworking person. Shortly after graduating from UCLA he went to work for the brokerage house of what is now known as Morgan Stanley. His nearly around-the-clock efforts and persistent dedication led him to being promoted to a Senior Vice President after just couple of years of joining the firm and he remained a devoted employee with Morgan Stanley for almost 20 years. Toward the end of the twenty-year period, when the stock market collapsed, Keith became involved with a friend who had for years been buying and remodeling properties and then selling them and had invited Keith to partner with him on some real estate endeavors. Also at this time, Keith and Alison had just started dating and knew early-on that they wanted to get married.

As a consequence of Keith's real estate ventures, he made poor decisions for which he, Alison, my husband and I are still feeling. At the time he entered his plea, Keith and Alison were newly married and together agreed that Keith should plead guilty, learn from his mistakes and move forward so that they could start a family with this all behind him. They didn't know at the time about another hurdle that lay ahead - seven years into trying to have a baby with countless fertility treatments that have taken their tolls on them physically and emotionally have still been fruitless. Now it appears they will have to resort to adoption. The problem is that as Keith and Alison looked into adoption, they were told due to the felony charges, adoption would not be realistic. This breaks our hearts, because Keith would make a wonderful father and we would be ecstatic to be grandparents. Our older son, Greg, is unlikely to have children, so we are eager to see Keith and Alison successfully be able to bring a child into their lives in some form or another so that we can all have the roles we so desperately want - us to be grandparents and Keith and Alison to be parents.

Keith made a poor decision and became involved in this situation and accepts this. It is unfortunate that Keith can never return to a career that he really loved, but it is more than devastating to impact his ability to start a family. I truly hope and that something can be done so that Keith and Allison can adopt and become a family.

Thank you for your time and consideration.

Herbert B Goodman, M.D.                    Tanya C Goodman

# EXHIBIT B

## CONGREGATION BETH SHOLOM

*301 14TH AVENUE*
*SAN FRANCISCO CALIFORNIA*
*94118*

Joanna P. Sheridan
Partner - Rappaport & Sheridan
260 California Street, Suite 1002
San Francisco, CA 94111

3rd of *Iyyar*, 5778 (4/18/18)

To whom it may concern—

I am writing as the senior rabbi of Congregation Beth Sholom, where I have been serving since 2015. In this capacity, I have known the Goodman family, who have a longstanding history with the synagogue as members since 1969. In times of celebration and sorrow within our communal family as well as personally, I have come to know Keith and Allison. Keith has been a member of CBS since birth, attending Hebrew school, having prepared and celebrated his bar mitzvah rite of passage under Rabbi White. During my tenure, Keith has been involved in attending prayer services on the High Holidays (which includes the annual rites of the Day of Atonement or *Yom Kippur*) as well as for communal celebrations and in times of sorrow, supporting other members of our communal family in times of loss and tragedy. Keith currently dedicates approximately 5 hours per week delivering hot meals to those in need as part of the CBS program called, *Chicken Soupers*, which prepares and delivers meals to the elderly and infirmed who are homebound from the synagogue. Keith has also volunteered in programming for young adults at CBS (known as YABS) in the past and hopes to continue that in the near future.

I have counseled and studied with Keith's about his feelings of genuine remorse known as *charatah* after the mistakes he made in transgressing the law and the poor judgement that led to it in the past. Keith is acutely aware of, and committed to, the process of *teshuva* or rehabilitation so as to realize atonement for these actions. To effect this atonement, Keith has undergone both the spiritual introspection as well as the commitment of his time and energy to help those in need. Given these crimes were committed approximately seven years ago, there have been a cycle of seven Yom Kippur services for Keith to realize atonement—that atonement is granted from the heavenly Judge once the spiritual work has been completed on this earth. Seven is a complete cycle in Judaism, and so spiritually atonement has been realized and granted many times over. I have also advised and prayed with and for Keith and Allison in their ongoing journey to create a Jewish family. According to Jewish law or *halakhah* the first commandment of the 613 is to "be fruitful and multiply" and establish a Jewish family. Desire to fulfill this sacred obligation continues to inspire Keith and Allison on their journey someday for a child, including an inordinate commitment of time and resources to fertility therapies. This journey of dashed dreams has taken an immense toll on them as well as their extended family and friends. But they continue to pray and dream of that day. In my estimation as a spiritual leader and pastor, Keith understands fully that while the process of *teshuva* is a lifelong journey of introspection, his rehabilitation that has emerged from his years of atonement should allow him to move on with his life and sacred aims of creating a Jewish family. Keith is an upstanding Jew who deserves a second chance, to regain his self-esteem to become a father, and as a result a more fully present husband and son to his family. Judaism holds the law in the highest regard, but also understands that within the heart of the law at the place of most rigorous judgment, there lies a core of mercy. As rabbi to Keith and his family, I humbly suggest that the most constructive form of *teshuva* as rehabilitation would be to give him that second chance to stay in the community on probation and giving of himself through volunteer work as a productive member of his nuclear family and communal family as worthwhile means of morally atoning for his wrongs.

Sincerely, in truth,    Rabbi Dr. Aubrey L. Glazer

# EXHIBIT C

**Charles A. Phelps**
120 Avila Rd.
San Mateo, Ca 94402
E-mail:*cap008@me.com*
Phone: (650) 678-3539

January 25, 2018

To Whom it may Concern:

I am a Financial Advisor with a major Wall Street brokerage firm having started in the business January 20, 1977 as an Account Executive with EF Hutton & Company. I continued my career with that firm (or its successor firms) for 36 years, 24 of those years in management and branch management. In my capacity as Branch Manager of the Shearson Lehman Brothers office in San Mateo California, I hired Keith Goodman in 1993. For the next eleven years, I watched Keith grow as a person and grow his career as a Financial Consultant. Unlike some in the industry, where there is always a temptation to cut ethical corners to improve the bottom line, Keith was always cautious in being certain he complied with all regulatory and ethical rules and always erred on the side of caution.

In 2012, I recall Keith coming to me and openly discussing his situation, and although his conduct and subsequent plea did not involve Morgan Stanley (Shearson Lehman successor) or its clients, he felt that it was important to disclose what had happened to the extent possible (apparently the federal prosecutors asked him to refrain from disclosing the details) to make sure that Morgan Stanley was not adversely affected. Sadly, Keith was terminated, and as a consequence by company policy, he forfeited all of his Capital Accumulation Plan earnings (equaling 25% of his salary deferred for approximately fifteen years and unvested,) his unvested stock options and he had to repay a retention bonus. From my perspective, Keith conducted himself with the utmost professionalism, putting his clients and his employer before himself. This was just another example highlighting that despite his very serious mistake in judgment, he is nevertheless, a man of character.

In closing, I understand that there will most certainly be consequences to his conduct, but knowing Keith and his wife Alison for many years, I hope that there can be a sentence that does not prevent them from becoming parents and moving forward in growing their family and moving forward with their lives.

Sincerely,

Charles A. Phelps

# EXHIBIT D

# HOLLI P. THIER, J.D.

To whom it may concern,                                    January 31, 2018

My name is Holli Thier and I have been a member of the State Bar for the past 27 years. Over the course of my career I was fortunate to work in both criminal justice and civil service positions, very early on as an extern at the District Attorney's Office, Special Prosecutions Division, and now in elected office as a Member of the Tiburon Town Council.  I have also had the pleasure of knowing Keith Goodman both personally and professionally for more than twenty years.

I first met Keith Goodman while we were both volunteer Board Members on the Jewish Community Federation's Young Adult Division Board. My first impression of Keith was that he gave his energy and time to the cause because he sincerely cared for our community. He hosted social gatherings, delivered meals to the needy and coordinated fund-raising efforts, always focusing on how he could make a positive impact in the world. On one occasion, Keith and I joined about 100 fellow members of the United Jewish Communities on a mission to Argentina to help a Jewish community that was suffering after the economic crisis. Keith devoted considerable time raising funds for the mission, and then spent his time while we were in Argentina sitting down with those who had lost everything to listen to their needs. He offered his time and energy to try and find solutions that would make their lives better. While Keith and I served on the YAD Board, he served as Chair of the Latke Ball Committee, served food at Glide Memorial Church, and was involved with numerous other fundraisers and nonprofit work with me.  I was impressed then with his hands-on commitment to community service, and to this day, Keith and I both continue to volunteer in many different organizations.

I also know Keith professionally as he served as my broker at Morgan Stanley Smith Barney. Keith loved his career and was a highly respected Senior Vice-President at the time that he was approached by the FBI in this case. Keith has been open with me about the nature of the charges and his role in the underlying conduct, and I have seen the substantial losses he suffered as a result of his conviction. Over the past six years, Keith lost his job, his broker's license, his 20-year career as a financial advisor, and most recently, Keith learned that he and his wife cannot conceive a biological child and that his felony conviction will prohibit adoption. This final loss - the loss of his ability to start a family - is a devastating and extreme consequence for Keith under the circumstances of this case.

While I appreciate the need to punish Keith for his misconduct, I think the past six years have done so.  In my opinion, Keith remains one of the most amazing people I've ever met, and I hope that he will one day be able to know the joys of being a father.

If you would like further information, please do not hesitate to contact me at (415) 407-4843. Thanks so much for your time and attention.

Holli P. Thier, J.D.

# EXHIBIT E

**Alison Paige Goodman**
550 10th Avenue
San Francisco, California  94118

To Whom It May Concern,

When I was growing up my mom recorded in my baby book what I wanted to be at every age. And every year without fail I said, "a mother." Over the years that was paired with being a teacher and eventually evolved into being a middle school counselor, which I have been for the past 12 years. I love every aspect of my job – even the toughest days – but my true calling in life is now, as it has always been, to be a mother.

I met my husband Keith Goodman over a decade ago. On our first date, I took the risk of being completely open about my desire for children, and while conventional wisdom may have dictated that was not a good dating strategy, in our case it lead to a wonderful connection. We held hands and talked about our love for children and desire to become parents in a Thai restaurant until closing time that night, and we have continued to work toward that dream ever since.

We were married in 2010 and began to try to start a family. We dreamed of our future, of the love we would give, how we would nurture our children to grow and hopefully have kids of their own one day. Keith and I both have one sibling, but no nieces or nephews, so we hoped that our children would help to unite our families and serve as a bridge to bring our siblings closer to us. But we never expected that we would still be childless, 7 years, 11 rounds of IVF, 9 rounds of IUI's and countless other interventions later. There is a constant heartache we face every single day in fear of the fact that our dream may never actually happen.

The physical and emotional toll on me of the past seven years of fertility treatments is difficult to put into words. My saving grace is Keith, who has been selfless, patient, understanding and humble all along the way. He comforts me every month that we learn we still have not conceived a child as I cry into my pillow that I'm "broken" and he assures me that I'm perfect. He believes in me even when I don't believe in myself, and he was strong for me - even though I know he was crumbling inside himself - when we lost our baby at 13 weeks 2 years ago.

My greatest fear in life is that Keith and I may never become parents. When there's a great deal of turbulence on a plane or a car runs a red light in front of me, my first thought isn't a fear of dying. My first thought is that I can't leave this earth before I've become a mother. I've wanted to be a mother since as far back as I can remember. The thrill I had when my mom took me downtown to buy my doll a stroller when I was 5 was relived every month that Keith and I waited eagerly to learn if we were pregnant. But the devastation that followed when we learned that yet another round of fertility treatments failed knocked me to the ground.

At this point, having consulted with multiple infertility specialists and pursued every possible avenue, we finally have come to terms with the fact that we will not be able to have a biological child of our own. Nevertheless, our dream to start a family remains strong and we want to pursue adoption as an alternative. Sadly, we have been advised that Keith's felony conviction will likely prevent us from doing so.

Having children and creating a family is one of the most instinctual and fundamental things we do as humans, and it has been my most precious desire since I can remember. Walking by an empty room every day that we hope will one day be a nursery serves as a constant reminder that my dream may never come true, and I am struggling to withstand the heart break. I'm writing this letter in hopes that some how, some way, there can be a creative solution that removes the obstacle of Keith's felony conviction from our path forward to becoming parents through adoption.

Thank you for your time and consideration.

With gratitude,

Alison Goodman

# EXHIBIT F

Academy- 2
ed Heart Cathedral- 2

Academy- 1
St Georges- 1
Wallenburg High School-1

# 8th Grade, Most Likely To...

*By Bea Fong and Stephanie McGuire*

We took a survey of the 8th grade, asking who they thought would be where later on in life. It was all done in good fun. The following people received a majority of the votes by their classmates to be most likely to....

**Marry and Divorce ten times**– Liz Blackwell

**Be a model**– Charlotte Richardson, Sara Galvin and Diane Reid

**Be President**– Emily Kearney

**Have ten kids**– Alison Jacobs and Sara Galvin

Be a doctor– Kanami Fujii

Be a teacher– Susanna Palatucci

Go to Harvard– Stephanie Johns

Be a rock star– Sarah Niven and Sosia Bert

Live the Longest– Dawn Matsui and Emily Dellas

Win the Lotto– Katie Starr and Erika Williams

Best hair– Bea Fong

Best dressed– Mia Bravo-Canales and Sara Galvin

Prettiest eyes– Emily Dellas and Susanna Palatucci

Weirdest– Stephanie McGuire and Sarah Niven

# EXHIBIT G

Dell Jacobs                                                 January 31st, 2018
510 El Camino Real Unit 204
Burlingame, CA 94010


To whom it may concern:

How do I write a letter about the past seven years – Alison and Keith's seven-year journey of infertility?  It's been so difficult with many many downs and some ups.  Alison was pregnant two years ago and lost the baby at 15 weeks.  I wasn't sure any of us would recover from that but we all did.  Alison and Keith have been through all of this together and both have been positive and plan to never give up.  Alison has been through IVF ten times with all the meds and procedures and as a mom I wish I could do this for her or at least protect her from the pain.

Alison has loved babies from the time she was a toddler.  My friends all knew my joke about Alison - I used to tell her, "Alison if someone kidnaps you, tell him the names of all your dolls (20) and what they do!"  (I figured by that time she would be delivered back to me.)

Alison started babysitting when she was about seven years old.  She babysat for the neighbors' kids, was a nanny in college and took a nanny job when she was in graduate school.

It's been such a difficult journey but I thank God that Keith is by her side for every doctor visit and every procedure.  They are doing this as a team and are hoping so fervently for a baby.

If their efforts to conceive a baby doesn't work, they would love to adopt a baby.  I was adopted at one day old into the most loving family. My parents are gone now but there isn't a day that goes by that I don't think about them and miss them so much.

Alison is a school counselor at Mill Valley Middle School. Her personal life is filled with doctor appointments, medications, injections and procedures, but she doesn't let that interfere with her dedication to her students.  I volunteered at her school on Challenge Day (a national anti-bullying program) and loved seeing how she interacts with the students and how much the students adore her.

Alison and Keith are kind, smart and loving and will be wonderful parents.

*Dell Jacobs*

Dell Jacobs
(Alison's mom)

# EXHIBIT H



University of California
San Francisco

Date: 1/18/2018

To Whom It May Concern:

**Marcelle I. Cedars, MD**
**Professor & Director**
**UCSF Department of**
**Obstetrics, Gynecology,**
**and Reproductive Services**
Marcelle.Cedars@ucsf.edu

**UCSF Center for**
**Reproductive Health**
499 Illinois Street, 6th Floor
San Francisco, CA  94158
Tel: 415/353-7475
Fax: 415/353-7744
TTY:415/885-3889
www.ucsfhealth.org
www.ucsfivf.org

University of California
San Francisco

Alison and Keith Goodman have been patients under my care since April of 2014. By that time, the couple had already undergone 3-4 IVF cycles and had been advised to pursue oocyte donor.

Once at UCSF, the couple underwent an additional 7 IVF cycles, using novel stimulation protocols and changes to laboratory processes. The patient conceived on her first cycle but unfortunately had an early ectopic pregnancy. She conceived again on her 3rd cycle. This cycle was unfortunately noted to have a birth defect consistent with non-viability at 12-13 weeks. The patient returned but was not able to conceive again despite good response to stimulation.

Since this time, the patient has undergone another stimulation cycle and a treatment with in vitro maturation. All cycles consistently have shown oocyte/embryo quality to be much less than anticipated based on her age or ovarian response.

Given the above, it has been determined this couple will not be able to successfully have their own biological child. In light of these efforts and consistently poor results at more than 3 centers, the couple has elected to pursue other options. I support this decision and acknowledge their dedication to the process and their strong desire to build a family.

Please let me know if you should have any further questions.

Sincerely,

Marcelle I. Cedars, M.D.
Professor and Director
Division of Reproductive Endocrinology and infertility
UCSF School of Medicine



# EXHIBIT I

# GYEMANT PARIS LAW
## Creating Families
1330 Castro Street, San Francisco, CA 94114
www.adoptsf.com   (415)513-5502   EFax (855)473-1877



January 18, 2018

To Whom It May Concern:

I have been an attorney for nearly twenty years, licensed in California, and for nearly a decade have practiced in the area of adoption law and policy. In 2011, I founded a solo law practice, Gyemant Paris Law, focused exclusively on adoption and surrogacy cases. I also worked for two years as an Adjudications Officer for the Department of Justice, Immigration and Naturalization Service (now Citizenship and Immigration Services under the Department of Homeland Security), where I managed the international adoption program at the policy level, worked on a variety of adoption issues, and advised local adjudications officers on the interpretation of federal regulations. I also co-wrote federal regulations, including the rules on the Hague Convention on International Adoption. I have managed over 100 domestic adoption cases, working closely with adoption agencies and other adoption professionals to assist clients in completing their adoptions.  Over the course of my career, I developed a particular expertise in assisting clients with difficult complexities to their adoption cases to navigate the process.

Keith and Allison Goodman have consulted with me regarding their desire to adopt a child, and in particular the impact that his felony conviction will have on the process. I

1

have evaluated their situation in relation to the rigorous processes in place for California's foster child to adoption program (or "fost-adopt"), for international adoption, as well as domestic private adoption. Based upon my experience and expertise in adoption, I believe that it will be extremely difficult, if not impossible, for the Goodmans to adopt a child if Keith has a felony conviction on his record.

All three potential avenues for adoption require very high scrutiny of the prospective adoptive parents, including the requirements of a homestudy where a felony conviction would be discovered. California's "fost-adopt" program is the most restrictive and rigorous adoption process available to families because these adoptions involve children who are wards of the state. The State of California retains legal custody of the children and the requirements to assure the safety and security of the children are extremely high. I have worked with families who have considered this route to adoption, and based on my experience I believe that Mr. Goodman would be  immediately disqualified from adoption through the "fost-adopt" process.

Similarly, International Adoption is very restrictive, as adoptive parents must satisfy not only the requirements of the adoption agency and the foreign government where the child was born and resides, but also the regulations set forth in the Hague Convention for Protection of Children and Co-operation in Respect of International Adoption. To illustrate how restrictive international adoptions have become since the Hague Convention was implemented in 2008, one only need to look at the numbers: In 2004, almost 23,000 children entered the United States for the purpose of adoption, but by 2016, only 5,370 children were adopted by U.S. citizens through international

2

adoption.  As stricter rules came into effect the process became more and more competitive, and it is my professional opinion that Mr. Goodman would be barred from adopting through this process with a felony conviction on his record.

With foster care and international adoptions essentially barred, private domestic adoption is the only possible avenue for the Goodmans to start a family if Mr. Goodman has a felony conviction. However, based on my years of experience in this field I believe it would be highly unlikely that the Goodmans will complete even a private adoption with a felony conviction. The homestudy process, which must be completed by a licensed adoption agency, requires FBI fingerprints, interviews with the adoptive parents, and a review of their qualifications.  Agencies will look at the totality of circumstances, including the type of crime, the time passed since the conviction, and what the individual had done since that time, to decide whether to approve a homestudy for that individual or family. Assuming in the unlikely event that the Goodmans received approval of the agency for the homestudy, Mr. Goodman and his wife would then need to be selected by an expectant mother to place her child with them.  This is an increasingly competitive process in the United States, as less and less women choose adoption, birth control has lowered the rates of unexpected pregnancies, and the increased competition caused by the bankruptcy last year of one of the largest national agencies, headquartered in the Bay Area, which resulted in fewer opportunities for adoptive parents. With a felony conviction, Mr. Goodman will be at a significant disadvantage when being compared to other expectant parents, particularly given the increased competition overall for domestic adoptions.

3

Adoption is an emotional ride that requires a careful balance in the relationship between the expectant mother and the adoptive parents. Expectant mothers have many qualified families to chose from, and they are in control of this decision.  Adoptive parents are in the position of ceding control to the Expectant Mother to choose them over other families. Women placing their children for adoption are looking for a better life for their child.  There is no question that if given a choice between two equally attractive families, the Expectant Mother will not chose the Goodman family if Mr. Goodman has a felony conviction.

Sincerely,

GYEMANT PARIS LAW

Anne Gyemant Paris, Esq,